Our fifth case of the day, Appeal 24-2068, Rainey v. Lewis, is going to be submitted on the briefs. We will move to case number six. This is Appeal 24-1694, Kelsey Smith v. Michael Whitsel, and Mr. Atkus, we're going to begin with oral argument from you. Michael Atkus Good morning, may it please the court, my name is Michael Atkus. I'm here this morning on behalf of defendant-appellant Michael Whitsel, asking the court to reverse the district court's order denying him qualified immunity on the Plaintiff's Section 1983 claim for denial of medical care to Dalen Key, while Ms. Key was a pretrial detainee in the Macon County Jail. Key's death was tragic, and her estate will not be without a remedy, regardless of the outcome of this appeal. Michael Atkus Why is that? Michael Atkus Are those medical malpractice case claims supplementary jurisdiction state law claims? Michael Atkus So, the court's precedents establish two different rules. First, there's a general rule that a correctional officer must summon medical care for a detainee who is in obvious distress from a serious medical condition. Michael Atkus And second, there's a more specific rule that where there's division of labor between non-medically trained and medically trained staff at the jail, the non-medically trained officer's duty to act arises only when he has reason to know that the medically trained staff is providing inadequate care. Mary Striegel Didn't your client admit that under the division of labor he was required to observe Ms. Key here? Michael Atkus Sure, and he was certainly required to observe her. Mary Striegel And is there any evidence that he saw her get medical care during this critical time period? Michael Atkus I think it's undisputed that she did not—well, I mean, I guess it depends, Judge, on how you—how broadly or narrowly you want to define medical care. Mary Striegel Any care from a medical provider, other than the one nurse who looked through the window and didn't go in to give any care? Michael Atkus No one specifically examined or assessed Key during Witzel's shift. That's an undisputed fact. Mary Striegel And he never—your client never reached out to any medical staff to say, hey, she's getting worse. You should come check on her. I think that's undisputed as well. Michael Atkus That's also undisputed. The appeal involves the legal question under what circumstances one of the two rules that I mentioned earlier applies to the exclusion of the other. It's our position that the district court made an error of law when it applied the broader duty rather than the narrower one to the undisputed historical facts of this case. Mr. Schlosser will argue that there are genuine issues of material fact precluding us reaching the legal question, and therefore this appeal should be dismissed. Can you explain to us why you believe there are not issues of fact? Based on—I think you're referring to the jurisdictional issue. The defendant is conceding all facts in light most favorable to the plaintiff, and under those historical facts is where we still—undisputed historical facts, we still believe we're entitled to qualified immunity under that set of facts. It's not my intention to dispute anything that anyone says that's not favorable to my client here. I'd say this isn't the type of case where qualified immunity depends upon whether the plaintiff reached for his gun before an officer fired. That kind of case is oftentimes qualified immunity would be tied up in a factual dispute, but here the historical facts are undisputed. Specifically, and I pointed out and tried to clarify in pages three and four of my reply brief, those facts that I'm pointing to that we posit should place this case within the ambit of the more narrower or the sometimes shorthanded medical deference rule. Those facts are by time Correctional Officer Witzel ever had any responsibility over Daylen Key, two doctors, Dr. Ray and Dr. Kostersen, had already issued orders concerning her care. Do you dispute—and we have the video evidence—do you dispute that a reasonable jury could find that the time period leading up to her death that she was in obvious distress at that point? I would say if the court decides that that general rule is the one that should apply rather than the medical deference rule, then there's a question of fact. Okay, so if the rule that your client had some responsibility to act if he saw her in obvious distress, you agree there's an issue of fact on that? Yes. Okay. Yes. The doctors had issued orders, the nurses had provided Key with medications pursuant to those orders, and Nurse Thompson had taken steps to have Key removed from general population to the medical observation cell just the evening before her death. At the very least, I think there's no existing precedent under such historical facts that would clearly establish that the broader duty applies instead of the narrower one, which plays into the clearly established or the second prong of the qualified immunity analysis. I do see I'm into my rebuttal time. If you'd like to reserve the remainder, that's fine. Yeah, unless there's any specific questions right now. No, thank you, Mr. Atkus. All right, thank you, Judge. Mr. Schlosser will move to you now for argument on behalf of the appellee. May it please the court. Yes, sir. My name is Fred Schlosser. I represent Kelsey Jill Smith. She is the administrator of the estate of her deceased 21-year-old sister, Daylynn Key, and she's also in a representative capacity for Daylynn's two minor children. The first thing we should do is look at the brief and the concessions made by Macon County and Correctional Officer Witzel. At page 9, while Witzel had the opportunity and means to observe Key's persistent vomiting and, quote, other physical distress over the course of several hours, he had no training on the signs, symptoms, or health risks of opioid withdrawal. Then it says, they admit at page 9 of their brief, opening brief, during his shift he never saw any medical staff physically touch Key or take her vital signs, nor did he ever communicate any observations or concerns about Key's behavior to any medical staff. That goes to, Your Honor, St. Eve's questions about what the factual record says. But before we get to that, we should talk about the training. I don't like to read, but when it comes to training and policies and procedures manuals, you've got to be precise. The County Jail Policies and Procedures Manual that bears Crossing Health Care's crest, and it bears Macon County's crest. On page 1 of that manual, it sets forth the division of labor with respect to health care to inmates in the Macon County Jail. It recognizes on the first page of an extensive manual, the delivery of health care to detainees is a joint effort of custody in health care staff, and is best achieved through trust, cooperation, and open communication. It goes on to give examples of what types of conditions may need communication. It lists diabetes, we've all seen the diabetes, eslick, tachycidosis cases in the inmate setting, but it also says withdrawal from alcohol or drugs. That's the situation we have here. It's approved by the Chief Medical Officer, Chief Executive Officer, and the Board Chairman of Macon County. So that applies to both the security guards as well as the health professionals. Now, the jail policy, that manual, describes what TRIBE 2 officers' responsibilities are. In this case, Correctional Officer Witzel was in charge of the TRIBE 2. The TRIBE 2 has a general population of segregated inmates they look after, but also every inmate in the medical cells, of which there was only Dalen Key at this time. He has a responsibility to do an inmate count. That's at the beginning of his shift and at the end of his shift. That's a security function. Are the inmates in the facility? But there's another component to his obligations and responsibilities, and that is welfare checks. And those welfare checks must be conducted at a minimum of every 30 minutes. And those welfare checks is to assess the overall well-being of the inmate. That has a medical observer component to it. It describes in its policy manual, well-being checks are intended to verify the safety and health status of an inmate, pay attention to movements, breathing, et cetera, to make sure the inmate is okay. Security cameras may be used to assist routine monitoring of inmates, but they are not a substitute for physical well-being checks. Those were his obligations. That's the division of labor as set forth, not by the court when they're in an abstract or in a correctional facility. That's by the participants here, Macon County and Crossing Health Care. But we know, Mr. Schlashler, that jail policies can't set the constitutional floor. I understand you're arguing this in part, that this creates an issue of fact, but that can't set what the constitutional division of labor is. So if you would address Mr. Ackes' argument that under the case law and what the constitutional division of labor requires, that he should prevail here. Okay, under the case law, and I believe you were a justice on the Parsano v. McGee opinion of a Michael Carter death that occurred in Decatur Memorial Hospital, if I'm not mistaken, in Macon County. Their policies were changed after the death of a previous inmate. In fact, Macon County switched from Decatur Memorial Hospital to Crossing Health Care. But I think in answer to your question, the division of labor, the question here is, under medical care and whether Officer Witzel should have the safe harbor, I call it, of medical deference. No, because under the medical care is not just abstract. The courts are clear in the previous cases where they found qualified immunity that we've got to look to the serious medical need and the time frame of the interaction between jail guards and medical health care. In this case, he had an obligation to communicate. He doesn't have to be a doctor. He doesn't have to be trained. He doesn't have to do anything. You've seen the video, hopefully. It doesn't take anyone with any medical training to see that she was in serious medical need. The division of labor is if he wants the medical judgment deference and basically escape liability, that's what it does, he's got to communicate that. Nurse Dowdy, LPN Jacoby, he didn't say anything. He went in there. He fed her her tray at 517. After watching her vomit for a couple hours, he gets on at 230. He talked to one of his colleagues, Derek Flower, and says, I got an inmate thrown up, and he was instructed by a guard, oh, guard, watch her closer. He's supposed to monitor by video. He's supposed to monitor physically her health and welfare. He didn't do so. He observed her. He knew she was thrown up. He went in and gave her her tray and watched her laying on the vomit-soaked floor and crawl across the cell and onto her bunk. Saw two full trays from her breakfast and her lunch. She hasn't eaten. She's been vomiting. She can't even stand up. He doesn't even say anything. He didn't communicate anything. Now, Justice Sainte-Eve, you mentioned she wrote – pardon me? Judge Sainte-Eve. Judge, I'm sorry. Thank you for the promotion. Maybe that'll help. I don't know. Judge Sainte-Eve, you mentioned that the nurse rolled over. That's not a factual what she saw. You can't see it on the video. There's no indication that there's a communication between Officer Witzel and Nurse Jacoby. She denies that there was – that she was ever told that there was a problem. And she also denies that it's not her job to have the inmates' cell, medical cells, up on her monitor. In fact, it's not her practice, even though it has the capability. And I think as far as the case law goes, Kramer is helpful. Correctional officers got qualified immunity in Kramer. But there was communications. There was active involvement between the medical staff, the nurse in particular, and the inmates. They notified the nurse to seizure activity they observed. Now, she said, he's faking it. And she said, when they asked about vitals, his vitals numbers are better than mine. They should be able to defer to that judgment, even if it ultimately turns out to be not acceptable. So if we conclude that there are genuine issues of fact that would preclude jurisdiction for this appeal and the matter were to go back and those issues of fact were to be sorted out, then the concept of qualified immunity might still exist. It's just within the judicial purview, and it's done after those fact issues are resolved. Is that correct? I think it could be left up to the jury of whether qualified immunity is still on the table. I don't think that's correct. I think the jury may resolve fact issues, but ultimately it's the trial judge. Right, right. Well, I mean, they discern the factual issues. Qualified immunity is a legal principle determined by the court. On these facts, the judge couldn't determine it based upon the misapplication of facts. But back to Kramer, there they avoided liability. They did what they could. They got help. They got assistance readily available. Now, the assistance wasn't effective, but that can't be on the correctional officer here. He did nothing. And Kramer clearly states that you cannot, the duty is you cannot ignore, as far as the clearly established law, Dobbie v. Mitchell-Lockshee, it states in there both the correctional officer and the nurse were both denied qualified immunity. It's not a zero-sum game. It's not a Venn diagram that doesn't connect. They can both be liable. And in this case, they are. And the jury should be able to determine that or determine one is versus the other. I see I have my time is up. Thank you, Mr. Schlosser. Thank you. Mr. Ackes, we'll go back to you now for a bubble argument. Thank you, Your Honor. Just a few points. Incidentally, I don't think I've ever seen a more real-life example of when you have the law, argue the law, and when you have the facts, argue the facts than I think we're seeing in this appeal. Unsurprisingly, I prefer to talk about the law here. Counsel is arguing that communication between the correctional officer and the nurse, it seems like now counsel's conceding that that nurse was providing care for Daylen Key. The deference rule requires a preconditioned communication between the CO and the nurse. That's not clear from this court's cases. The cases say that when the inmate is under the care of medically trained professionals, that the CO's duty is not to communicate obvious distress to the nurses. The CO's duty is only to take action when he has reason to know that the nurses or doctors basically are dropping the ball and not doing their job, which is an extremely high burden that, you know, without some sort of evidence that a CO knew the particulars of a specific course of treatment or whether that treatment was being followed through on, I think it's hard to say. A couple seconds about Dobby, since that's, of course, the case that plaintiff relied upon in his brief and the case cited by the district court, I think Dobby's factually distinguishable because what we have, the facts I'm pointing to here were conspicuously absent in Dobby. In Dobby there was no doctor had put down any order for Mr. Dobby's tooth abscess. No doctor had prescribed any medicine to treat that abscess or the pain that Mr. Dobby was experiencing. No nurse had administered any medicine. So when Mr. Dobby says to the correctional officer, can I see a nurse? I'm in pain here. Then we're still within the ambit of the general rule. Thank you, Mr. Atkus. Thank you very much. Thank you as well, Mr. Schlosser. The case will be taken under advisement.